UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION


UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff,         )
                                   )  Case Nos.
        vs.                        )  10-03029-01-CR-S-GAF
                                   )  10-03029-02-CR-S-GAF
WESLEY PAUL COONCE, JR. and        )
CHARLES MICHAEL HALL,              )
                                   )
                Defendants.        )


TRANSCRIPT OF TELEPHONE CONFERENCE
BEFORE THE HONORABLE GARY A. FENNER
APRIL 7, 2014
KANSAS CITY, MISSOURI


APPEARANCES

FOR THE DEFENDANT HALL:
    MR. FREDERICK A. DUCHARDT, JR.
    Attorney at Law
    P.O. Box 216
    Trimble, Missouri 64492

ALSO APPEARING:
    Magistrate Judge John T. Maughmer


    Proceedings recorded by mechanical stenography, transcript
produced by computer

KATHERINE A. CALVERT, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER
CHARLES EVANS WHITTAKER COURTHOUSE
400 EAST NINTH STREET
KANSAS CITY, MISSOURI 64106
(816) 512-5741

1

APRIL 7, 2014

(The following proceedings were had in chambers pursuant to a telephone conference:)

THE COURT: Hello.

MR. DUCHARDT: Hey, Judge, it's Fred here.

THE COURT: Hi, Fred. How are you? John, are you there too?

JUDGE MAUGHMER: Yes.

THE COURT: As I'm sure you both can suspect, I'm making a record of our conversation here today.

Fred, on your motion for the PET scan testing let me tell you what my concerns are.

MR. DUCHARDT: Okay.

THE COURT: I'm concerned with the timing of this, and I don't mean to make any assumption faulting you in that regard because I'm sure you've been working hard and trying to get everything put together, but here we're three weeks from trial; and if we were to go forward with this, there's an awful lot that needs to be done yet. It would, I believe, be pushing it to get everything in order and get it to the government and let the government analyze your results and the evidence that you intend to offer and any challenges they might have to any of that to even get that completed before the trial was over.

And I have some concern about the potential benefit from doing this, and obviously you know a lot more about the

particulars of the case and specifically your client's situation than I do, but it -- I wonder if there is any serious dispute as to significant mental health issues on the part of Mr. Hall; and if it is pretty much a given that Mr. Hall has some serious mental health issues, I'm not sure what the PET scans results might benefit.

Then we also have Daubert issues that are, I suspect, inevitably going to come up regarding the admissibility of this, and we've been through some of this before, and I do have some reservation about the Daubert issues that might be raised and the need that there would be to thoroughly consider that. So I don't know. That's a fair amount to throw out at you.

Let me ask John before I have you respond to any of that. Is there anything else, John, that you would like to express one way or another on where we go from here on the PET scan request?

JUDGE MAUGHMER: I think those are the issues of primary concern. You know, I mean Mr. Hall was in the medical center at Springfield to begin with, so I think you're right. The question of whether he has mental health issues is probably fairly well settled, but I think those are the issues that need to be addressed.

THE COURT: Okay. Fred, what do you have to say on my reflections on this?

MR. DUCHARDT: Judge, I understand everything that you're saying and every one of those things I get. Let me start with the timing situation to just kind of explain why we are here at this point as opposed to earlier.

Last summer when I probably would have been doing some of these things, the government came forward to both Coonce's counsel and I and made some serious overtures that they might offer a plea agreement or make some kind of withdrawal of the death penalty prosecution, and so I put my efforts pretty heavily on trying to go forward with all of that, and I tried to give them an awful lot of information along those lines, and at the same time I didn't figure it was wise to be spending government money on things that would not be necessary if that all came to fruition.

Now, of course, by the fall it turned out that all of that fell apart and it didn't happen, but that's the reason why I wasn't working on those things in the summertime and was working on other things related to the case that still bore fruit but really more had to do with not spending money on things that it looked like we might not need to.

As soon as I got the word from the government that they were going the way that they went, I enlisted Dr. Wisner, and you got the appointment of Dr. Wisner through approval from Judge Riley, and Dr. Wisner got right to work.

On top of the information that he had was testing

that we had done, neuropsych testing that gave some indications of difficulties that not anything spectacular in the neuropsych testing as far as I could tell, but Dr. Wisner has come up with some conclusions that there are some issues in the neuropsych testing that Dr. Wisner has picked up on and also in his evaluation has come up with concerns about that he absolutely believes that the imaging is necessary.

There is a -- your point about the government's position in terms of vis-a-vis our mental defense is an interesting situation. One would think that because Hall was in the federal medical center and in a mental ward that would not be an issue with the government, but it is. In fact, if you go back to the evaluation that was done of Hall on the competency issue, there are very strong opinions of Hall and his mental illnesses of major depression and also bipolar disorder that are -- just encounter some opinions that were done prior to the alleged offense, and now in the evaluation the doctors at Butner had evaluated Mr. Hall have backed up on all of that stuff saying that they -- despite these other determinations previously by other doctors in the BOP that they don't believe that.

Also the whole ante of the situation got up when the government decided to enlist the Park Dietz team. So when I came to the place where I knew I needed to get the evaluation, the testing done, it was not as simple as going to one of the

local hospitals because you and I both have had experience with Dr. Dietz, Dr. Mayberg, and I've had experience particularly with Dr. Mayberg in another case in which -- the Purkey case in which she opined that if you did the testing just in a regular hospital and didn't do -- and I alluded to all of that in the motion -- that her position is that the way that this is done in normal medicine is not done right. You can't just eyeball the scans. You've got to have this testing. So what I went about -- basically I say testing, the statistical analysis.

So what I went about trying to do is figuring out essentially how we could do this without having to send Chuck up to Pennsylvania and have that initial expense money-wise but also costs to Chuck because of his Crohn's disease and the strain that would put on him, and I was able to do that, and I put this together timewise. If we can get the approval for the funding, I can get this done next week in terms of having all of the materials.

You know, you're absolutely right. This may show nothing. I can't know that. Nobody can know that. And to the extent that the local doctors say that there is no indication, we wouldn't do the work by Dr. Gur, but to the extent that the work by Dr. Gur needed to be done, we would have the raw data to him by next week and should have the results back by the week after.

That's what I've got set up in terms of timeframe.

I admit that's not the best, but those are the reasons why we ended up in this time frame as opposed to an earlier one.

And the government is certainly going to question the severity of Mr. Hall's mental condition to the point of trying to minimize it, and what the -- what the brain imaging can do is bring things back, quite frankly, where they were in terms of a diagnosis of Mr. Hall before this case ever got filed.

THE COURT: All right. Well, I understand your explanation on the timing issues, and I think that that was a legitimate position for you to take; and as I said in the beginning, I'm not -- I assumed that you had reasons for what you were doing, but I do believe that it would be improper to proceed on this at this point in time for the reasons that I've already expressed in spite of your explanation as to why you believe we should proceed with the PET scan. So I'm going to deny your request for authorization to proceed with the brain image testing as requested in Document 635.

Anything else on that?

MR. DUCHARDT: Nothing. You gave me a fair opportunity to explain it all to you, and I appreciate it.

THE COURT: All right. Judge Maughmer, anything -- anything further you would like to offer on any of this?

JUDGE MAUGHMER: No. I think that covers the basis.

THE COURT: Okay. All right. Well, thank you both

7

for taking the time to join me, and we will go forward from here.

MR. DUCHARDT:  Thank you, Judge.

JUDGE MAUGHMER:  Thanks, Judge.  Thank you, Fred.

THE COURT:  Bye.

(Adjournment)

CERTIFICATE OF OFFICIAL REPORTER

I, Katherine A. Calvert, Federal Official Court Reporter, in and for the United States District Court for the Western District of Missouri, do hereby certify that the foregoing is a true and correct transcript of the stenographically reported proceedings in UNITED STATES OF AMERICA, Plaintiff, vs. WESLEY PAUL COONCE, JR. and CHARLES MICHAEL HALL, Defendants, Nos. 10-03029-01-CR-S-GAF and 10-03029-02-CR-S-GAF.

Dated this 2nd day of May, 2023.

_____
KATHERINE A. CALVERT, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER