IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

WESLEY PAUL COONCE, JR.,              )
                                      )
            Plaintiff,                ) No.  6:20-CV-8000-BCW
                                      )      September 11, 2023
            v.                        )      Kansas City, Missouri
                                      )      CIVIL
UNITED STATES OF AMERICA,             )
                                      )
            Defendant.                )


ORAL ARGUMENT TRANSCRIPT
BEFORE THE HONORABLE BRIAN C. WIMES
UNITED STATES DISTRICT JUDGE

Proceedings recorded by electronic voice writing
Transcript produced by computer


APPEARANCES

For Plaintiff:        MR. JOHN JENAB
                      MS. FLORENCE PATTI
                      MR. KEITH O'CONNER
                      Jenab Law Firm, P.A.
                      P.O. Box 30
                      Lampe, MO  65681


                      MS. AMELIA BIZZARO
                      Federal Public Defender
                      Capital Habeas Unit
                      411 E. Bonneville Avenue - Suite 250
                      Las Vegas, NV  89101


For Defendant:        MR. RANDY EGGERT
                      US Attorney's Office
                      901 St. Louis Street - Suite 500
                      Springfield, Missouri 65806


Denise Carroll Halasey CCR, CVR-CM, RVR
United States Court Reporter

<u>September 11, 2023</u>

THE COURT: Okay. Good morning. This is Judge Wimes. My understanding is I have Mr. Eggert for the government, also Mr. Jenab, Ms. Bizzaro, and Mr. O'Conner, and Ms. Patti for the defense?

MR. JENAB: Yes, Your Honor.

THE COURT: Mr. Jenab, are you with me?

MR. JENAB: I am, Your Honor, good morning.

THE COURT: You know, let me tell you what I'm trying to do. I've had the opportunity to speak with my law clerk and talk about the briefing of the parties. You know, what I presume to do today is as you address or at least talk about the issues I may have some questions just particular about it. So maybe this kind of hybrid of an argument, but also a lot of questions from the Court. And so that is how I want to move forward. There are just a few or may be a little more questions that I have, and then what we could do probably, and then we can move into any outstanding issues as it relates to Mr. Hall.

Mr. Jenab, why don't you start. Why don't you layout the basis in which you believe this Court should grant your motion to release the names of the jurors and the alternate jurors from the trial.

MR. JENAB: Thank you, Judge.

First, I want to emphasize that in this motion we

are not asking the Court to compel any juror to do anything. We're not asking for discovery as in the compelled disclosure of information. Our only request is that the Court lift a prior restraint preventing us from informally contacting jurors. If the Court allows us to contact jurors, we will do so in an ethical and courteous fashion.

THE COURT: Mr. Jenab, let me ask you, and I'm sorry, there will be quite a bit of me interrupting. I just want to get to the issue. Let's say that this issue wasn't ordered by Judge Fenner, then are you suggesting that we would never have this phone call because you could contact?

MR. JENAB: Yes, I am, Your Honor.

THE COURT: And let me ask, the basis of Judge Fenner issuing that order was for what reason?

MR. JENAB: My understanding, Judge, is that it was because it was observed during the trial one morning that there was a handful of peaceful protesters outside of the courthouse.

THE COURT: Well, Judge Fenner may have not have thought that. I mean, so peaceful that he didn't want them contacting the jurors. But go-ahead go-ahead.

MR. JENAB: And Judge, as you know, I wasn't present and Mr. Eggert was. So if in anyway my description is inadequate, I'm sure that he will chime in.

I am not aware of any problem that resulted from

those protesters being outside the courthouse. I don't think it was a lot of them. I don't think that they accosted anyone, and I don't think that they had anything to do with the case that was a trial. I think that they just generally were opposed to the death penalty.

THE COURT: Sure.

MR. JENAB: But it was at that time that Judge Fenner entered an order prohibiting counsel from either party to contact the jurors.

THE COURT: Let me ask, Mr. Eggert, if that's the case, would you agree notwithstanding this order, they would have been able to contact the jury. Is that true or do you believe that or do you think that is not the case?

MR. EGGERT: Well, I don't know the answer to that directly, Your Honor. I'm not going to answer something I don't know the answer to without doing more research on the issue.

THE COURT: Sure.

MR. EGGERT: They could have tried to contact the jurors I supposed without that protective order in place by Judge Fenner. My issue here is it's more than just contact that they are asking for. They are asking for permission to talk to the jurors about the deliberation of the case itself, and going behind the verdict to discuss. This is more than just saying, hey, how did I do before the trial? Did I

represent myself for my client, that sort of thing, which is what a lot attorneys do when they talk to jurors at the end of the trial to see if they are doing a good job as an attorney. This is not that sort of contact we are talking about. This is contact the goes to the very heart of the deliberation process. The government is opposed to that type of contact for the reason we articulated in our briefing to the Court.

THE COURT: Right.

Mr. Jenab, respond to that, please.

MR. JENAB: Well, Judge, I think we sent out in our briefing some of the issues, you know, the issues that we have some concern about. One is an indisputable lack of fairness of some fairness in some voir dire questions that potentially allowed jurors to participate in the case without disclosing contacts at the Springfield Medical Center, for example, for their views on important matters to the penalty phase such as --

THE COURT: -- was that addressed on appeal?

MR. JENAB: Yes, Judge, it was. And I did want to make a brief comment on that. Mr. Eggert responded to that with essentially a law of the case argument. We don't think that that is applicable. What the Eighth Circuit was addressing was whether as a general matter the scope of the inquiry was an abuse of discretion by Judge Fenner. What we are attempting to find out was whether individual jurors had

information that nondisclosure of which prejudiced Mr. Coonce. It is very -- it's kind of -- in my view, Judge, it is analogous to the difference between a facial challenge to a statute and an as applied challenge. It may well be that as the Eighth Circuit said, as a general matter the scope of the Court's inquiry was not deficient to the extent that it constituted an abusive discretion even though the Eighth Circuit acknowledged that it did leave gaps in the jury responses. But it is also, and it is not inconsistent possible that in the particular case the result was one that was prejudicial. And that is kind of what I think what we are all concerned about, is to make sure that Mr. Coonce was tried by a fair and impartial jury.

THE COURT: Wouldn't that be -- that would arguably be the case in any case that is tried, criminal case or any case in which you believe or the Eighth Circuit believes that the District Court question left gaps somehow. I mean that would follow, right? Meaning, that's the argument we can arguably make if you look at the voir dire process and maybe questioning the Court left gaps, just as a practical matter I'm asking.

MR. JENAB: As a practical matter, I supposed it is possible in any case that a juror could hide information.

THE COURT: Is that what you're saying, hide information?

MR. JENAB: No, I was just trying to give you an example, when you're saying something could happen in every case, right?

THE COURT: Well, I want to be very particular to what you're suggesting here. I thought you suggested that in the question of Judge Fenner it left gaps, right? So that could arguably be the case in any case. If it was me, I ask questions, and you're telling me I left gaps, you should in this process have the ability to go back and talk to those jurors or prospective jurors.

MR. JENAB: And Judge, there is a procedure to avoid that happening, and unfortunately it didn't work here. Which was that both parties agreed that additional questioning regarding these issues was appropriate. And yet the questions weren't asked.

THE COURT: Okay. All right.

You can go ahead. I'll stop you at different times just so I can inquire. I appreciate it though.

MR. JENAB: Thank you, Judge. And I appreciate your procedure because obviously our primary purpose here is to answer the Court's questions. Particularly since I think the parties positions were laid out pretty well in the briefs.

THE COURT: You guys always think that, but sometimes there are questions for the Court, and that's why I have these so I can discuss and ask questions. I get it

though. Because, for example, you believe that the argument by Mr. Eggert was one that you just suggested in terms of -- and let me -- Mr. Eggert, why don't you respond to that? Why don't you respond to Mr. Jenab as it relates to the argument he was making.

MR. EGGERT: I hear what he is saying. If I'm tracking his argument he is suggesting that similar to how a statute can be constitutional in its application totality, it may be unconstitutional if it somehow violates the law as it applies to the specific individual.

THE COURT: Correct.

MR. EGGERT: I get what he is saying about here, while he is arguing generally that the Eighth Circuit was correct in finding that the voir dire was adequately handled, it may have not been adequately handled as it relates to a specific juror. But that is the issue of concern that I have Judge. The only way that this could be done -- the argument that is being made here is totally speculative. They have no idea what these jurors may or may not say. They are just making statements like, well, it's possible that one juror -- and that is actually a direct quote from Mr. Jenab, it's possible that one of the jurors may have misunderstood something. And we don't know because they're making statements that are not root in any sort of factual statement or allegation. They're looking to talk to these jurors who

deliberated on this case over nine years ago now on matters that they may or may didn't forgotten about. A time has lapsed. This is more than just contact to ask a juror, hey, how do you think we did during the trial? This is contact to ask the juror about the deliberation process and also how they were selected during the voir dire. And I think it is very speculative and not appropriate in these types of situations. That is my argument in response to his argument about -- voir dire may have been good in its totality, but it is not good as to one particular individual. Well, the only reason we -- we have no reason to believe or not believe that it is not good as one individual, they want to open up this can of worms to try to figure that out. And they have alleged nothing that would suggest that there was anything inappropriate. And the Eighth Circuit did do its analysis, and I would say as a side to the last statement by Mr. Jenab, while both parties may have been agreement that an additional inquiry was necessary or may have been helpful on a particular issue, in the end it is the Court's decision. The Court has the ultimate decision here. And the Eighth Circuit found in the appeal opinion that was filed here, that that discretion was appropriately handled by Judge Fenner. That would be my response. I hope that was adequate, Your Honor.

THE COURT: Yes. Yes, it was adequate. I would like Mr. Jenab to respond to kind of this speculative

argument. Well possibly based upon the gaps that something could have. That's where I go to the point Mr. Jenab where in any case we can make this argument to a juror. Well, Judge Wimes could have inquired just a little bit differently, then maybe this jury would have responded differently. Do you get it? I know you get it.

MR. JENAB: I do, Judge. I do understand what you're saying.

I think as a practical matter I think that Mr. Eggert's position while I completely understand it, I think it ultimately results in a Catch 22. Because what he is saying is essentially you have to come forward with concrete evidence that in fact there was misconduct before you can talk to the jurors when we can't discover whether there is in fact concrete evidence without first talking to the jurors.

THE COURT: That's exactly what I wanted to address. Give me some situation -- because it seems to me with regards to the rule, what does the case law say with regards to that issue? Because clearly there are some exceptions in which you may testify or a juror may testify and talk about. But do you have any case law to show me the circumstance? I understand what you're saying in terms of the Catch 22, but give me -- is there any case law that would suggest -- here, here is something analogous to what we have here which the allows, the Court allows attorneys speak with the jurors or speak with the

jurors about certain matters. Not just speak with them after we are in court about how did I do or how did the evidence come across, but more specifically.

MR. JENAB: Well, Judge, I think that -- you know, one of the difficulties here is that the issue comes up before the Court usually in a little bit different of a context. Namely, with respect to what testimony the jury can provide under -- the juror can provide under 606(B). So often times like in many of the cases that we cited in our motion the attorneys have already conducted interviews of the jurors, and have submitted affidavits or motions. In this case we are prevented from doing the initial investigation because of Judge Fenner's order saying that the parties can't contact the jurors absent permission of the Court. So in offering and asking the Court for permission, we are trying to lay out our concerns. But ultimately, just as the Eighth Circuit decided the direct appeal in terms of the Court's broad discretion, it's the same broad discretion that Your Honor has. Your Honor can grant our request based on what we have submitted in our motion in the exercise of your discretion. And that is all we are asking the Court to do. If it comes to anything then it comes to something, but otherwise if we simply contact these jurors and they say we don't want to talk to you, that's the end of the story. We're not going to harass anybody, we're not going to fail to honor their wishes if they don't

want to talk to us. So much of the concern that Mr. Eggert expressed in his motion about harassment and, you know, citing cases in which defendant put a string of 15 detectives to follow jurors around. Judge, as I hope you know, we're not going to do that. My cocounsel, Amelia Bizzaro, is affiliated with a very experienced Capital Habeas Unit and conducting juror interviews in their cases is absolute standard operating procedure. It's something that they do all the time.

THE COURT: And let me just explore one more area and then you tell me your thoughts, and then you can continue any further argument you want to make. When I'm in -- and maybe this doesn't make a difference. When I'm in that jury room with the jury after they come back with their verdict, and you guys are waiting in the courtroom saying, Judge, we'll be out here if the jury comes out. I tell the jury, I say listen, you can talk to them, you don't want to talk to them, I think it's good attorneys want to know your impression of the chain of evidence, how they do it, just to get the feel, and then I send them on there way. And some go in and some leave. And I get it and understand it. So I guess your suggesting that's how it will be? If they indicate that they don't want to talk or they can't remember, I do want to know your thoughts on that.

MR. JENAB: Absolutely, Judge.

If a juror indicates they don't want to talk to us,

that's the end of the inquiry.

THE COURT: I'm not saying that. You give them that they can talk or they don't have to talk or you just leave it up to them?

MR. JENAB: No, Judge. We're never going to suggest to a juror that they are required to talk to us. No, absolutely not.

THE COURT: I'm not suggesting that you're gonna suggest that. What I'm suggesting is this, are you going to give them the Judge Wimes' talk and not verbatim that, hey, you can talk or you don't have to talk, but we do want to speak with you. I'm not suggesting you're going to tell them they have to talk. I wouldn't think you all would do that.

MR. JENAB: Right. Right.

And Judge, I'm sorry, are you asking how we would approach them?

THE COURT: Yes, I am.

MR. JENAB: Okay. Yes.

THE COURT: Mr. Jenab, here's what I'm saying, if I have an attorney that called me up nine years later, and I'm just trying to be practical here. Call me after nine years, okay, I'm calling you about this case. Depending on how that particular person presented something to me, I may feel that I have to talk. And I may talk when I don't have to. When I have some authority representing someone in a current matter

pending before a Court, I may feel that way. So I have a concern there. You may say, Judge, that is no concern, but I just want to hear your response to it.

MR. JENAB: Well, in that case, the response is very, very simple. We will tell them up front that they are under no obligation to speak to us.

THE COURT: Okay. You can continue. And again, Mr. Jenab, don't feel the need -- there are some levels of query I wanted to have. There were certain things that I wanted to address myself. If you have nothing further, then that is fine. If you want to underscore any points to the Court you can do that so too.

MR. JENAB: Thank you, Judge, I really appreciate how you are proceeding here, because ultimately that is the most important thing, is that whatever questions you have we answer to the best of our ability.

THE COURT: Sure.

MR. JENAB: May I just make a small correction to a citation in our filing? I just feel in going over our motion I noticed this and I just wanted to correct it real quickly if I could.

In our motion on page, let me pull it up here real quick. On page 5, we referenced the point where the jurors came back and said that they were 100 percent certain that they could not reach a verdict. And then they came back just

a little while later with a unanimous verdict. For some reason, and I apologize for this error, the citation there says id. What we had intended and the correct citation is to ECF Document 879, and that is at pages 15 to 18.

THE COURT: There was a hammer instruction given, is that correct?

MR. JENAB: The judge did send them back and said he did ask them to try to reach a verdict. I've actually got that up here.

THE COURT: And that was on the appeal, wasn't it?

MR. JENAB: Yes.

THE COURT: Okay.

MR. JENAB: I'm sorry, go ahead, Judge.

THE COURT: And I guess my question was and to the extent you know, what was the timing of that? Was that before the question came with the 100 percent certain that they -- the judge had instructed the jury, you know, the hammer instruction or was that after the jurors informed the Court of this 100 percent certainty?

MR. JENAB: Can I have just a moment here? I actually have the transcript and I'm scrolling through it right now. Okay.

So they come back. We have reached a decision in regards to defendant, Coonce, but I feel with 100 percent certainty we are unable to reach a unanimous decision in

regards to defendant, Hall. And then.

THE COURT: Okay. I have my law clerks look at it with me. I think it was after the fact that they came, and I think Judge Fenner may have sent an instruction back to them saying, hey, deliberate and come to a decision if you can.

MR. JENAB: I think you're absolutely right, Judge. I think the language he used was you should continue your deliberations and try to reach unanimous verdicts.

THE COURT: Okay. And I know you use that as a basis in which, I mean, such a quick turnaround, is that right or what you believe to be --

MR. JENAB: Yes.

THE COURT: Okay.

Mr. Eggert, do you have anything that I've discussed with Mr. Jenab, do you have any questions, thoughts are anything you want to add to this conversation?

MR. EGGERT: Well, no, Your Honor, as to the actual substance of the law. I think we have kind of plowed that ground.

I would say as a preliminary matter and to make it clear the government's thoughts concerning the defense counsel's motivations here. I have nothing but the greatest respect for Mr. Jenab. I practice with him. So I don't believe he is going to harass or intimidate jurors. I can't see that happening with the other defense counsel here. So

I'm not concerned about that. The cases we cited are the cases we cited. So we're trying to make any connection between facts and one particular case in this case. We are just trying to argue, Your Honor, it is highly irregular to allow defense attorneys to ask after this much time has gone by, substantive questions concerning the deliberation process of the jury itself. Reaching out to jurors about questions concerning how they presented the case is one thing. And that's not what they're asking to do here. The other thing I would follow up on, Your Honor, is the Court has the discretion to do whatever the Court wants to do here. And we agree with Mr. Jenab, if you want to do something different than Judge Fenner, you have the right to do that. But we would that if you're going to allow the defense attorneys to reach out to these jurors after so much time has elapsed than it would perhaps be better practice for the Court to do that. Have the Court reach out, and the Court can then instruct them exactly the way you want to instruct them as to their rights to speak or not to speak to the defense attorneys. You have that conversation with the jurors. If the jurors say, no, I don't want to speak to the defense attorneys or yes I will speak to the defense attorneys, then that could be communicated to them through the Court. To allow them to reach out individually I think that's unfair to these jurors after so much time has lapsed. That's all I have on that

issue, Your Honor. If there is anything else I can try to answer for you, I'd be happy to.

THE COURT: Thank you. I appreciate that. I hope Mr. Jenab and attorneys that in no way is the Court thinking there would be something done that would be improper or nefarious. I'm not suggesting that and I don't want in any way any question I may have to suggest that. Nor was I trying to suggest that. I was just trying to practically go through the process if they were approached how they would be approached. And I'm not suggesting anything underhanded or nefarious or otherwise. So that's the Court's position.

Mr. Jenab, do you anything else? I can rely on your briefing, but I just wanted to ask a few questions. And then -- and so if you have anything you want to wrap up with, you can do so.

MR. JENAB: Thank you, Judge, I think we have covered everything that I had wanted to mention.

THE COURT: Yeah, sure. Let me ask you this, and then I will open it up to the other attorneys on the line. I know Mr. O'Conner and Ms. Patti, you're on the line too, so I'm going to move forward the same way as I did with Mr. Jenab. What are y'all's thoughts on that? If, in fact, the Court were to do it, that the Court somehow communicate with the jurors to the extent I can, with what they can and can't do, and then you all can contact them. I just want to know

general thoughts from the attorneys. And Mr. Jenab, we can start with you first.

MR. JENAB: Thank you, Judge.

I think from my review of the case law that if the Court wants to impose conditions on the contact or such as what Mr. Eggert suggested, it is within the Court's discretion to do so. I am not -- we're not requesting that the Court do that. We have obviously represented to the Court that we are going to be fair. We are going to be courteous. And we are in no way going to suggest to a juror that they are obligated to talk to us. In fact, we will affirmatively tell them that they are not obligated to talk to us. So I hope that addresses the Court's concerns, but I would acknowledge that if the Court did think that something, you know, that involving the Court directly, right? We weren't looking to increase Your Honor's work load with this.

THE COURT: I appreciate that.

MR. JENAB: If the Court that was appropriate, I do think it would be within the Court's discretion.

THE COURT: Thank you.

Ms. Patti, do you have anything to add to that?

MS. PATTI: Yes, Your Honor.

THE COURT: Ms. Patti, I think you are breaking up. I'm unable to hear you.

MS. PATTI: Is this better?

THE COURT: Yes.

MS. PATTI: I apologize. And so are you asking if I have any thoughts on specifically -- contacting the jurors?

THE COURT: Okay. I'm sorry. You are cutting in and out. Say that again please.

My question related to if the Court prior to you all contacting, contacting the jurors and say, hey, listen, kind of what I do after a verdict came back in the jury room and I send them out to the attorneys. Just say, hey, you can talk to or not talk to the attorneys.

MS. PATTI: Sure, Your Honor.

So while I agree that you have the discretion to do that, I don't think it's necessary. I think it's a solution in search of a problem. Everyone agrees that we will approach these folks courteously and not in anyway indicate that they have to speak to us. And you had kind of asked some practical questions about how these interviews might go, and I can tell you that when I talk to witnesses I tell them my name, I explain who I represent, and I tell them that if they have some time and are willing I would like to talk to them about the case. Sometimes they tell me to go away and so I do. Sometimes they are willing to sit and chat right then and then we do. Sometimes they say now is not a good time, but I can call you, we can make an appointment, we can talk later, that sort of thing. And so this is something that people in our

profession do all the time. And I can say I know in particular Mr. O'Conner and Ms. Patti have interviewed many, many jurors, I have never had a complaint of harassment. And so while I think the Court can do something like that, there's absolutely no reason why it is necessary given that nobody actually has any concerns.

THE COURT: Okay. Thank you.

Why don't you try to give the Court from your perspective why the Court should grant this motion and allow you all to speak to them?

MS. PATTI: Sure, Your Honor.

I obviously was on the line for the first argument so I will just try to answer some the questions that you raised.

THE COURT: Sure.

MS. PATTI: First of all, as to the protest I do just want to clarify that in the transcript it says that there was a newspaper report that there would be a protest and that is when the order was issued. And I emphasize that just to point out that we know that the order was not entered because anything scary happened. It was prophylactic and so I just wanted to spell any concern about how that protest went down.

THE COURT: Okay.

MS. PATTI: The other issue is that but for this order, yes to your question, we would be able to contact the

jurors without involving the Court. And I also want to clarify that this is the kind of thing that happens all the time. Most I think or certainly many state courts including Missouri don't have any rule prohibiting contact with jurors and so interviews are very frequently conducted in state court cases. And courts very frequently rely on information learned in those interviews. And in addition, this jurisdiction doesn't have any local rule or law that would prohibit this contact, it is just based on Judge Fenner's order which again was a kind of cautionary step because of a report of a potential protest.

THE COURT: Let me ask you, Ms. Patti, I think, you know, Mr. Eggert raised the question this is nine years later. I would suspect in other cases that it could be kind of this length of time as well. Is that true or not true? I'm just kind of thinking about that. You would imagine as cases go through the appeal process whether it is state or federal court and then they come back post conviction, then it could run a number of years.

MS. PATTI: That is absolutely correct, Your Honor. I only do post-conviction capital cases and this is not my oldest case. This is not the trial that happened the furthest back in time, so yes, that is very common.

THE COURT: Thank you. I just kind of had a thought and I just wondering your perspective on that.

MS. PATTI: No, I appreciate it. That's a great point. But in this in kind of this context not even that long ago.

I want to address Mr. Eggert's point about what we would be asking about. And I just want to note that this is a very unique situation. The Circuit Court actually cited an exception to Rule 606 in its order because they needed to fill in some of the context of what happened, and they did that with a statement that the Court, the District Court made after talking to the jurors. And so everyone involved has felt the need to clarify what is going on. On the other hand, it was a direct appeal record, right? And so it wasn't developed for purposes of understanding why the jury form was filled out the way it was filled out. The jurors have to put yes or no as to whether they reached a decision, and then they didn't find many mitigating factors to exist despite the fact that they were not contested. Given that the District Court asked the jurors what was going on, and report back to the parties, and the Eighth Circuit felt that an exception to the 606 for a mistake in entering the jury form was necessary in order for a jury to conclude in. You know, that is really an acknowledgment of something strange that is not just a caution of deliberation that would be an exception to 606. But again, the record is not developed, the conversations with the jury weren't on the record, and so all we are seeking to do is to

develop that record which is exactly the point of 2255 proceedings. I take everyone's point that Mr. Eggert's position puts parties in a Catch-22, and I think that is worth considering. On the other hand, even with that position we satisfy the standard because of what is already in the record in this case, but then also the questions that are unanswered by that record.

And as far as -- you had asked about some of the case law. I just wanted to mention a couple of the cases that the government actually cited. And in the Little case, it says a proper preliminary showing of likely jury misconduct or witness incompetency could be an exception. And all it says there is plaintiff have not demonstrated or alleged any basis for why they needed to interview jurors. But it allowed that had the party alleged a basis, the interviews would have been permitted. And again, we have alleged that. And then I would also point out that we have cited several cases, which I'm happy to discuss in more detail, explaining Courts relying on information learned from interviews with jurors conducted after the trial.

THE COURT: Okay.

MS. PATTI: I'm happy to obviously answer any questions that you have.

THE COURT: You know, I think I've had the opportunity, and I've heard from everyone and so that was

helpful for the Court to kind of fill in gaps in my mind about certain things. And I think you all have done that, and I appreciate everyone's time.

MR. EGGERT: Your Honor.

THE COURT: Yes.

MR. EGGERT: I'm hoping you would allow me a few minutes to kind of address some of the issues briefed by Ms. Patti?

THE COURT: Of course.

MR. EGGERT: I want to make it clear that the government is not alleging or believe that there is going to be harassment of jurors. The harassment is really not the issue from the government's point of view. It's the mystery of inconvenience and surprise. You're dropping in on these people's lives nine years after you've met them. And although I appreciate Ms. Patti's comments that this is not the oldest case that she has, of that she has had cases older. I'm looking at it from the juror's perspective, not our perspective. And the jurors have gone on with their lives, and now they are being approached by defense attorneys that they do not know and being asked questions about things that happened a long time ago, and being asked to come up with answers that are going to be then used to support a pleading that hasn't even been filed. And so that is the concern that the government has. It's not harassment. I think they will

be very polite. There is no reason for them not to be polite. They want to get from these witnesses information that will hopefully be helpful to the case, but my point is they are approaching them cold, so to speak, and they are approaching them in a posture that doesn't give them any advance notice what is about to happen. That is the concern about that issue, about, you know, letting the Court handle the procedure as opposed to letting the attorneys reach out and contact these jurors themself. We did -- in our briefing articulate that that has happened in other districts. That the Court actually possesses, maintains the power to conduct -- it reaches out to the jurors to do this sort of preliminary backdrop. Reach out to see if whether they are willing to talk to the defense attorneys on these issues. So that is the concern that the government has. I don't believe they were going to be harassing, but I do believe for the reasons that I suggested that it would be a better approach for the Court to handle this as opposed to just letting the defendants reach out and talking to these individuals by themselves.

But secondly, I do want to clarify a little bit of the procedure and background of how this protective order came to be. The evidence that has been articulated is correct. It happened as a result of a particular protest that was taking place, and it was not instigated by the defendants or the defense attorneys. It was kind of public protest and the

Court issued it's order which I believe -- let me see. I start talking and then I lose my place.

THE COURT: And I don't want you all to focus -- that is not a focus of this Court. I was just curious. The Court was just curious. In no way is that a focus or it doesn't have any basis in my determination.

MR. EGGERT: I do want to at least fill a little bit more on that just real quickly.

THE COURT: Sure.

MR. EGGERT: The government said at the very end of the trial on July the 3rd, of 2014, did make a specific motion for an order prohibiting contact with jurors. That was apart from and distinct from this Court's decision to impose this protective motion during the course of the trial. The Court, on the very same day in Document 884, found the government's position or the government's motion 883 moot based upon its previous filing of not allowing any contact with the jurors without the Court's permission, and then filed Document 788. So the government did make a specific request beyond just this protest issue to not allow this willy-nilly contact with jurors after the verdict was determined to have been handed down. And the Court found that decision moot because it had basically continued on what it had found during the trial on past the verdict stage in the post verdict or the post-conviction part of this particular case. So I wanted to

kind of make it clear that this was addressed again, it wasn't just addressed at the time of this incident, it was addressed again later in the proceedings, and the Court reiterated that it was -- Judge Fenner reiterated that it was going to impose this protective order for the Court's reasons.

THE COURT: Okay.

MR. EGGERT: And then lastly, I would say I get the Catch-22. But it's a Catch-22 in reverse here. What is being suggested by both parties is if we talk to jurors to discovery -- or perhaps misconduct that took place based upon how the jury form was handed down as the Eighth Circuit addressed in the appeal of this case. Well, the only way they could do that, right, is talk to jurors. So that is the reverse Catch-22 so to speak. Is they make a -- there's a statement that that may have happened, but the only way they are going to be up to make that determination is to actually speak with the jurors to determine that. I think it would be better practice honestly let them file their 2255, let them make the specific allegations and misconduct they think may exist even speculatively and then let the Court make a determination based upon that articulated reason as opposed to allowing what is really a large fishing expedition whether to cast lines in the water to see what jurors say and pull up what they can out of the water and use it in the 2255 that they haven't even filed yet. That's all I have, Your Honor.

I appreciate your time, thank you.

THE COURT: Thank you. I appreciate it.

Any quick follow-up, Ms. Patti?

MS. PATTI: Yes. Thank you, Your Honor.

First of all, there is no Catch-22 in reverse. What we have at this point already are specific allegations. If we were to file a 2255 before talking to the jurors we would plead to this issue, and we would be right back here asking for the Court's permission to contact the jurors, because we have already shown enough to include this in the pleading. What we would like to do is find out what the facts bear out. If, in fact, there was no outside influence, no mistake, no issue, then there wasn't. We are just seeking to develop the record. And so I really don't think there's any reason to delay this given what we have already shown.

As to the sort of context the order being entered, I'll just say very quickly, there is no question that Judge Fenner had the discretion to enter this order, and there's no question that you have the discretion to allow us to talk to the jurors. In fact, the order just says, counsel won't contact the jurors without the court's permission. So it's very clearly something that remains within the Court's discretion.

As to the point about inconvenience and surprise, again, I just don't see how the Court reaching out to somebody

Denise Carroll Halasey CCR, CVR-CM, RVR
United States Court Reporter

is more convenient or less surprising than counsel approaching them.  I just think that it is not, this is not a solution that is really tailored to address convenience or surprise. The only reason for the Court to manage this process would be if there was going to be some concern about the attorneys or investigative behaviors.  And that seeing that is not the case I think is very reasonable.  So again, like I said before, I just think that is a way of doing things that isn't called for.

THE COURT:  Okay.  Well, I appreciate you all taking the time.  I think the Court has a lot of its questions answered, and I'll be able to issue an order on this matter relatively quickly.

MR. EGGERT:  Thank you, Judge Wimes.  I appreciate your time.

MR. JENAB:  Thank you.

(THEREUPON, the following proceedings were adjourned.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of the proceedings in the above-entitled matter.

October 25, 2023

/s/ Denise C. Halasey
Denise C. Halasey, CCR, CVR-CM, RVR
United States Court Reporter
Denise Carroll Halasey CCR, CVR-CM, RVR
United States Court Reporter